1

**CARSON P. BAUCHER**
California State Bar No. 298884

2

**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900

3

San Diego, California 92101-5030
Telephone: (619) 234-8467

4

Facsimile: (619) 687-2666
Carson_Baucher@fd.org

5

6

Attorneys for Jesse Sanders

7

8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:  23-CR-270-BAS-1 |
| Plaintiff, | Hon. Cynthia Bashant |
| v. | Date: June 10, 2024 |
| | Time: 9:30 a.m. |
| JESSE SANDERS, | **DEFENDANT'S SENTENCING** |
| Defendant. | **MEMORANDUM** |

11

12

13

14

15

The loss of Sgt. Meyer is a true tragedy.  By all accounts he was a loving

16

husband and son, who served our country honorably.  But just because there is a

17

victim of this offense, does not mean that there is a villain.  Mx.[1] Sanders asks the

18

Court to impose a sentence that takes into account the mitigating circumstances of

19

the crime, the addiction and trauma that led Mx. Sanders to commit the offense, and

20

the incredible transformation that Mx. Sanders has made while on pretrial release.

21

As will be explained in more detail below, the offense itself is mitigated.  Sgt.

22

Meyer, like Mx. Sanders herself, was an addict, and entered into the drug transaction

23

with eyes wide open.  After learning from a television segment about Mx. Sanders's

24

efforts to stop using fentanyl, Sgt. Meyer (29 years old) reached out to Mx. Sanders

25

(then 22 years old) via social media to ask her if she could help him find fentanyl.

26

27

---

[1] Defendant is gender non-binary, meaning that she does not fit into traditional male or female gender categories and, in fact, identifies with both.  Instead of "Ms." or "Mr.," Defendant prefers the gender-neutral title "Mx."  Mx. Sanders is comfortable with he/him/his, she/her/hers, or they/them/their pronouns.

28

He offered to give Mx. Sanders a portion of the drugs for her assistance. Mx. Sanders, who was unhoused on the streets of Oceanside and deep in her fentanyl addiction, agreed. A day or two later, Mx. Sanders secured $150-worth of fentanyl for Sgt. Meyer. They met up outside of the motel room of the third-party supplier (whom the government has not charged), where Mx. Sanders gave Sgt. Meyer the fentanyl, and where Sgt. Meyer gave Mx. Sanders $150 as well as a portion of the fentanyl. Mx. Sanders received no cash payment for her role as "middle" in the offense. The entire $150 went to the supplier, while Mx. Sanders kept and used the fentanyl given to her by Sgt. Meyer. Thereafter, Mx. Sanders and Sgt. Meyer exchanged additional text messages in which Mx. Sanders and Sgt. Meyer both noted the strength of the substance, and in which Mx. Sanders advised Sgt. Meyer to make sure he had Narcan with him. Sgt. Meyer explained that he understood, and he and Mx. Sanders exchanged thank yous and pleasantries, acknowledging that one another seemed like a good person.

In further mitigation, are the truly tragic circumstances that led Mx. Sanders to be unhoused and opioid-addicted on the streets of Oceanside. Born with heroin and methamphetamine in her system, Mx. Sanders survived a childhood and adolescence characterized by drug and alcohol abuse, physical violence, sexual assault, displacement, and abandonment. As a gender non-binary person, Mx. Sanders was regularly chastised and physically beaten for her gender expression. She had no positive role models within her family whatsoever and, after aging out of the foster care system at the age of 18, found herself unhoused, struggling with an opioid addiction that had come to control her life.

And finally, a mitigated sentence is further supported by the complete about-face that Mx. Sanders has taken since her release on pretrial custody nearly a year and a half ago. In that time, she successfully completed an inpatient drug treatment program, graduated from a sober living home, secured steady employment, enrolled in community college, and bought her very first car.

In recognition of the mitigated nature of the offense, Mx. Sanders's substantial equities, and her proven commitment to change, Mx. Sanders respectfully requests a custodial sentence of 48 months, 12 months of which should be served on home detention, followed by three years of supervised release.

## I.    Jesse Sanders

### A.    The Traumatic Start to Mx. Sanders's Life

Today, Mx. Sanders's mother, Regina Badillo, is her greatest support.  Now sober and thriving, Ms. Badillo represents a shining example of what Mx. Sanders can accomplish if she moves forward in her sobriety.  But in 1998 and 1999, when Ms. Badillo was pregnant with Mx. Sanders, things were very different.

Ms. Badillo is from Oceanside, California.  Her father was a member of the Hell's Angels, and Ms. Badillo and her siblings grew up in a home in which drug and alcohol use ran rampant.  Members of the biker gang were constantly in and out of the home, partying and using drugs no matter what young eyes were watching.

In the late 90s, Ms. Badillo was deep in her addiction, falling victim to the same addictions that plagued her parents, siblings, and friends.  She became pregnant.  It was her eighth pregnancy.  Seven months out of the 40-week pregnancy, Ms. Badillo was in prison.  When she was released in her third trimester, Ms. Badillo went back home, to the same drug- and alcohol-filled world that she had come from.  She started using again.

When Mx. Sanders was born, doctors could tell right away that something was wrong.  A blood test revealed that Mx. Sanders had heroin and methamphetamine in her system.  As the newborn received medical care to treat her for withdrawal symptoms, medical staff contacted the authorities who determined that Ms. Badillo was unfit to take custody of Mx. Sanders.  Mx. Sanders was removed from her mother's care at birth.  Mx. Sanders's father, who had another family in a nearby neighborhood, wanted nothing to do with the child.

That is how Mx. Sanders came into the world.

DEFENDANT'S SENTENCING MEMORANDUM

B.      Childhood through Early Adolescence

For the first six months of her life, Mx. Sanders was in the foster-care system, shuffled between a series of state-run institutions and home placements. At six months, Mx. Sanders was placed in the custody of Ms. Badillo's mother, back in the very home that Ms. Badillo herself was raised in. As Ms. Badillo puts it, "Jesse was thrust into an adult world." Mx. Sanders's



grandmother loved Mx. Sanders, but the home was no place for a child. Not only was drug and alcohol abuse still prevalent, but the various adults who came in and out of the home engaged in highly inappropriate behavior. On multiple occasions, Mx. Sanders walked in on her grandmother, who was often drunk or under the influence of methamphetamine, having sex with different men.

When Mx. Sanders was eight years old, her grandmother died of breast cancer. The loss hit Mx. Sanders incredibly hard. At that point, Mx. Sanders's mother was in and out of the picture – often making promises of reunification that she failed to keep. Mx. Sanders was therefore sent to live with Ms. Badillo's sister. Things were not safe there either. At that home, a father of one of Mx. Sanders's half-brothers sexually abused Mx. Sanders, pinching Mx. Sanders's nipples and making her sit on



his lap while the man was erect. One of her uncles used to sit in the living room, watching pornography and masturbating in the open.

Around this time in her life, Mx. Sanders began to realize that she was not like the other little boys in her neighborhood. She wanted to wear nail polish and makeup and she liked playing games that were more traditionally

DEFENDANT'S SENTENCING MEMORANDUM

played by girls.  Mx. Sanders's uncle observed this behavior and felt that it was his job to "beat the faggot out of [her]."  He would take Mx. Sanders into the bathroom, strip her naked, and whip her repeatedly with his belt.

Mx. Sanders recalls a home filled with physical violence.  Her uncle was physically abusive to his girlfriend.  Mx. Sanders recalls him trying to choke the girlfriend, and also remembers that the uncle and girlfriend once fought each other so hard, that they attempted to stab each other in the eyes with the needles they had been using to inject drugs.

Mx. Sanders's half-brother, 11 years her senior, was in a gang.  In an effort to toughen Mx. Sanders up, he would hit her, and take her with him to hang out with other members of his gang.  On one occasion, when Mx. Sanders was only five years old, he made her watch as he and his fellow gang members senselessly beat up someone who wasn't supposed to be in the neighborhood park.

Mx. Sanders couldn't escape the violence anywhere.  She was constantly bullied by kids at school and in her neighborhood.  She was called names and mocked for her gender expression.  There was no place where she could feel safe.

Six months after Mx. Sanders's grandmother died, Mx. Sanders's favorite aunt also passed away.  Mx. Sanders was thereafter passed from one family member to another, each time feeling like she was a burden who did not belong.

There were passing moments when Mx. Sanders would stay with her mother. But by the time Mx. Sanders was 11, Ms. Badillo had another child, and was in a relationship with the child's father that was characterized by domestic violence and drug abuse.

With little to no supervision, Mx. Sanders fell prey to sexual abuse by older men.  Several men reached out to Mx. Sanders on online chatrooms, arranged to meet up with her, and then gave her alcohol and cigarettes in exchange for sexual favors.

The chaos and feelings of abandonment became too much for the young Mx.

DEFENDANT'S SENTENCING MEMORANDUM

Sanders.  At the age of only 13 years old, Mx. Sanders attempted suicide for the first time.[2]  She hung herself with a rope.  Fortunately, a family member was home at the time and, hearing the commotion, knocked down the door and cut her down.

### C.   Adolescence

Mx. Sanders re-entered the foster care system around the age of 12 or 13. Like before, she was shuffled in and out of various home placements and group homes.

Mx. Sanders had her first run-in with the juvenile delinquency system when she was 13 years old.  Growing up with sex on open display, and sexual abuse by family members being such a regular occurrence for Mx. Sanders, Mx. Sanders had a very confusing relationship with sex.  Mx. Sanders was also grappling with incredibly strong feelings of anger and resentment.  The combination did not make for a graceful transition to puberty and ultimately resulted in her juvenile adjudication. She was placed in juvenile hall where, at the age of only 13 or 14, she was regularly subjected to bullying, abuse, and solitary confinement.  While in juvenile hall, she attempted to slit her wrists and was a regular visitor to the facility's suicide watch.

Mx. Sanders's five-year stint as a dual dependency-delinquency youth in the state system failed Mx. Sanders.  Most troubling is the fact that while in a state facility, Mx. Sanders was sexually molested by a staff member, who forced her to orally copulate him.  The case resulted in a criminal prosecution of the staff member and a civil lawsuit against the facility, through which Mx. Sanders was paid a modest settlement.  Also concerning is the fact that there was an utter lack of understanding and resources for a young person struggling with her sexual orientation and gender identity.  Members of the probation office and state facilities regularly wrote Mx. Sanders up for defending her choice to wear makeup and expressing herself. And,

---

[2] Research indicates that trans individuals are 18 times more likely than cis individuals to attempt suicide.  *See* Suicide Thoughts and Attempts among Transgender Adults (Sep. 2019), UCLA's Williams Institute, *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf (last visited June 3, 2024).

even more concerning, Mx. Sanders ended up spending significantly more time in juvenile custodial settings simply because there were no placements that were able to take trans or non-binary youth.  As a result, Mx. Sanders spent far longer in custody than she should have.[3]

D.    Early Adulthood

At the age of 18, Mx. Sanders aged out of the foster care system.  With nowhere to go, Mx. Sanders found herself unhoused on the streets of Oceanside. She began using heroin and methamphetamine daily and quickly graduated to a full-blown addiction to fentanyl, which had become more prevalent, stronger, and cheaper than heroin.

Life on the streets was a constant dance with death.  In July 2019, Mx. Sanders herself was stabbed.  *See* Ex. D.  Five months later, in December 2019, Mx. Sanders was shot, when someone came looking for her half-brother.  *See* Ex. E.  Both times, Mx. Sanders thought she was going to die.

She did what she felt she had to to survive, engaging in property offenses to feed herself and support her all-consuming fentanyl addiction.  By the time of her arrest in this case, Mx. Sanders had overdosed no fewer than six times, being brought back each time by the life-saving and fast-acting overdose medication, Narcan.  Her addiction got to the point that Mx. Sanders had to use fentanyl every four to five hours.  She was no longer using to get high; instead, she was using simply to function and to stave off the debilitating symptoms of early withdrawal – a feeling that Mx. Sanders describes as "feeling like you're going to die."  How and where to get her next fix was a full-time job, and one that governed nearly every decision of her life.

---

[3] *See* LGBTQ Youth of Color Impacted by the Child Welfare and Juvenile Justice Systems (June 2019), UCLA's Williams Institute, pp.4-5 (finding that structural racism and LGBTQ stigma increase the risk of system-involvement for LGBTQ youth of color, that LGBTQ youth of color stay longer in child welfare and juvenile justice systems and are subjected to elevated risk of discrimination and violence once system-involved), *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBTQ-YOC-Social-Services-Jul-2019.pdf (last visited June 3, 2024).

23-CR-270-BAS-1

DEFENDANT'S SENTENCING MEMORANDUM

1    In 2021, when Mx. Sanders was 21, her mother, who was, mercifully, sober and
2    doing incredibly well in her recovery, was doing her best to find help for Mx.
3    Sanders.    She applied for help from Intervention, a popular A&E show that
4    documents an addict and the addict's family's plea that the addict seek help.  Using
5    the resources provided to her by Intervention, Mx. Sanders made a concerted effort
6    to get and stay sober.  She struggled, however, like most addicts do, and ended up
7    dropping out of the program and returning to the streets of Oceanside.[4]

8        It was at this point in time that Mx. Sanders was approached by Sgt. Meyer.

9    **II.    The Mitigated Nature of Mx. Sanders's Offense**

10        This is not a case in which Mx. Sanders sought out the decedent.  This is not a
11    case in which Mx. Sanders hid the nature of the substance.  This is not a case in
12    which Mx. Sanders worked as a drug dealer, getting paid in cash.  To the contrary,
13    Sgt. Meyer sought out Mx. Sanders.  He specifically asked for fentanyl.  Mx. Sanders
14    did not even supply the drugs; instead, she served as the person who transferred the
15    drugs from the dealer/supplier to Sgt. Meyer.  Her only payment came from Sgt.
16    Meyer, in the form of a portion of the fentanyl for her personal use.

17        On December 28, 2021, Sgt. Meyer contacted Mx. Sanders over Facebook:
18    "Hey what's up.  Were you on intervention[?]  I was trying to get some of your
19    connections if you had any[.]  My number is [XXXXXXXXX] let me know[.]"  Ex.
20    B.  On December 31st, Mx. Sanders replied:  "I was on intervention yes[.]"  *Id.*  Sgt.
21    Meyer asked if Mx. Sanders still "part[ook] in certain things" and, if so, if they could
22    "link up."  *Id.*  Sgt. Meyer, who worked as a substance abuse professional in the
23    Marines, acknowledged Mx. Sanders's efforts at recovery – "I know it can be hard to
24    get clean and stay clean" – but offered to "pay for both of us" if Mx. Sanders could

---

[4] A shortened, 11-minute version of the Intervention episode featuring Mx. Sanders is available on YouTube.    See "Intervention: Jesse's Drug Addiction Fueled by Difficult Past", *available at* https://www.youtube.com/watch?v=cJGh6pxMH3o (last visited June 2, 2024).  It provides very helpful information about Mx. Sanders's family background and the circumstances that contributed to her addiction.  The full episode is available online via Hulu.

connect him with a dealer.  *Id.*  After Mx. Sanders asked for clarification, Sgt. Meyer specified that he was looking for "H [heroin] or fent [fentanyl][,] whichever one[.]" He explained that he was looking for "150 [dollars] worth" and offered to "split [the drugs] with [Mx. Sanders]".  Mx. Sanders agreed to his proposal.

From January 1 to early January 2, 2024, Sgt. Meyer and Mx. Sanders solidified their plans to meet up for the exchange.  After Sgt. Meyer arrived at the designated meeting place, Mx. Sanders and Sgt. Meyer spoke in Sgt. Meyer's car.  There, Mx. Sanders explained that she had secured him fentanyl (not heroin) and gave him the full quantity he had purchased.  In turn, Sgt. Meyer gave Mx. Sanders $150 and a portion of the fentanyl, which he had apportioned into a separate baggie.  Mx. Sanders left and turned the $150 in to the supplier/dealer.  She kept the portion of fentanyl given to her by Sgt. Meyer for her personal use.

Thereafter, Mx. Sanders and Sgt. Meyers took up their conversation again. Mx. Sanders said, "[B]y the way[,] do you have Narcan? [. . .] You can get it anywhere no prescriptions no purchase[,] justvwalk [sic] in and ask and they're legally mandated to provide it to you then and there."  Ex. B.  She sent a screen shot of a Narcan flyer from CVS, which explained that the substance was available at any CVS nationwide as an "effective antidote to opioid overdoses."  *Id.*  Mx. Sanders followed up with, "Sorry if you already know[.] I just want y'all to be safe. . . . have an awesome day."  *Id.*  Sgt. Meyer replied, "You too and this stuff is pretty good please be careful[.]"  *Id.*  He assured Mx. Sanders not to worry because "[I] don't inject or anything just snort and its strong for[] me."  *Id.*

The conversation ended with mutual compliments.  Sgt. Meyer expressed gratitude that Mx. Sanders "didn't rip me off" because he "know[s] how risky this business is[.]"  Mx. Sanders explained how grateful she was to get a portion of the fentanyl, and Sgt. Meyer responded that he hoped he was "able to[] help [Mx. Sanders] out today[.]  I'm not greedy and like to share[.]"  Sgt. Meyer ended the conversation with a hint at maintaining their mutually beneficial relationship, but

23-CR-270-BAS-1

DEFENDANT'S SENTENCING MEMORANDUM

with a request that Mx. Sanders let Sgt. Meyer text first, because "like I said before I don't want my wife to find out[.]"

A.    Sgt. Meyer Went into the Transaction with Eyes Wide Open

Like Mx. Sanders, Sgt. Meyer was an addict.  That is apparent from his text message exchanges with Mx. Sanders.  In those messages, he explains his preferred method of ingestion (snorting rather than injecting).  *See* Ex. B ("I don't inject or anything just snort and its strong for.me").  He expressed an understanding of the drug buying business.  *See id.* ("I'm glad you didn't rip me off you know how risky this business is").  He evaluated the quality of the fentanyl provided to him.  *See id.* ("this stuff is pretty good").  And, characteristic of addicts, he indicated his desire to hide his habit from his loved ones.  *See id.* ("I will text you when it's safe not to talk to me like I said before I don't want my wife to find out") ("We can message now but once I say no more texts then wait for me to . . . hit you up").  His history of drug use is also confirmed by medical records produced in discovery, including the autopsy report, *see* Ex. F (Under Seal) at p.1 (explaining that Sgt. Meyer has a "reported history of illicit drug use"), and by his wife's interviews with law enforcement, in which his wife explained that Sgt. Meyer told her that he used to use cocaine and that in 2012 or 2013, he had gone missing under suspicious circumstances, finally emerging with dilated eyes, strange mood swings, irritability, and with cash missing from their shared bank account.

Sgt. Meyer was not tricked into thinking he was buying something other than fentanyl.  He specifically requested fentanyl or heroin in his messages with Mx. Sanders, and when together, Mx. Sanders made it clear that she had secured fentanyl on his behalf.

Sgt. Meyer was aware of the dangers of fentanyl.  This is evidenced by his text messages in which both he and Mx. Sanders advised one another to be careful.  The message was reinforced by Mx. Sanders's advice that Sgt. Meyers have Narcan at the ready.  Moreover, at the time of his death, Sgt. Meyer was serving as the "Substance

DEFENDANT'S SENTENCING MEMORANDUM

Abuse Control Officer (SACO)" for the 1st Maintenance Battalion of the United States Marine Corp.  In his role, he was in charge of operating the Battalion's random drug-testing program.  As outlined in a publicly available Marine Corps memorandum, a SACO's duties include dispensing "substance abuse prevention materials" in common areas, "[m]onitor[ing] Marines in the command aftercare program", and coordinating with "subject matter experts" to provide training on "the early warning signs and progressive nature of alcohol and drug abuse" and "referral[s] of abusers and alcohol abuse or dependency recovery."[5]  Text messages produced in discovery also include conversations with co-workers describing the particular family circumstances of Battalion members who had tested positive for drugs, and described their treatment options.  In short, Sgt. Meyer was certainly aware of the dangers and risk of death associated with fentanyl use.

B.    Mx. Sanders Was the "Middle" in the Drug Transaction, not the Dealer or Supplier of the Drugs

Mx. Sanders was not the owner or supplier of the fentanyl.  Instead, she served as the "middle" in the transaction, facilitating Sgt. Meyer's purchase of fentanyl from the third-party supplier of the drugs.  Mx. Sanders had no proprietary interest in the drugs and received no cash payment for her role.  Instead, Sgt. Meyer provided Mx. Sanders with a portion of the drugs he had purchased.

It should be noted that Mx. Sanders has no previous arrests or convictions for drug trafficking.  *See* PSR ¶¶ 30-49.  Her rap sheet is comprised of conduct explained by her drug use and homelessness.

---

[5] *See* Marine Corp Orders 5300.17, *Marine Corps Substance Abuse Program* (Apr. 11, 2011) at pp.1-5, 2-2, *available at* https://www.marines.mil/Portals/1/Publications/MCO%205300.17.pdf?ver=2012-10-11-163832-363 (last visited June 2, 2024).  The Order further specifies that it is "[i]nappropriate to appoint a Marine [as the SACO] . . . who experienced alcohol or domestic problems within two years of assignment" and explains that "[a] Marine assigned as a SACO/S, who is recovering from alcohol or drug dependence, will have a minimum of two years sobriety . . . ." *Id.* at 1-5.  No doubt it was out of fear of losing his job assignment that Sgt. Meyer tried to keep his drug use private.

C.   Mx. Sanders's Offense was not Financially Motivated; It was Addiction Motivated

For those of us who have never felt themselves in the vice-grip of an addiction, it may be hard to understand just how terrible it feels to be "dope sick" – a term used by drug addicts, generally opioid addicts, to describe the debilitating combination of withdrawal symptoms.  At the time of Mx. Sanders's offense, she was using more than a gram of fentanyl a day.  If she did not get her fix, she would suffer incapacitating physical and mental symptoms, including nerve pain, vomiting, hopelessness, migraines, delusions, and paranoia.  The dangers associated with withdrawal can be so severe, that medical supervision is recommended to safeguard against death.

Mx. Sanders did not help Sgt. Meyer in an effort to earn money.  She did so in an effort to stave off, for at least another day, her own dope sickness.

## III.   Mx. Sanders's Transformation on Pretrial Release

The Mx. Sanders of today is drastically different from the Mx. Sanders at the time of the offense.

Since getting out on bond, Mx. Sanders successfully completed an intensive drug treatment program at Stepping Stone, a substance abuse treatment provider that serves members of the LGBTQ community.  There, in a space surrounded by people who have similar world experiences, Mx. Sanders explored the many traumatic experiences that led her to use drugs.  After graduating from the program, she completed a number of months at Stepping Out, Stepping Stone's sober living home.  She attends meetings multiple times a week and is doing incredibly well.  She's been sober for nearly a year and a half.

The benefits of her sobriety continue to show themselves.  She has consistently maintained full-time employment and has even recently been promoted to shift leader.  She has enrolled in community college and is looking forward to pursuing a career in medicine and public health.  Thanks to her steady income, she's

been able to pay her rent at the sober living home and is looking into securing a lease. She has also been able to purchase a car for herself – a first for her. And she's found a health care provider who has been providing gender-affirming care, including hormone replacement surgery, which has greatly boosted her self-image and self-worth.

She is also, for the first time, able to connect with her mother in a real way. Both sober at the same time (which is a first), Mx. Sanders has been able to get the love and support that she had sought from her mother throughout her childhood. She is also able to benefit from Ms. Badillo's example. Ms. Badillo suffered from drug addiction for far longer than Mx. Sanders did, and is now, herself, a substance abuse counselor and runs a sober living home, serving as an example to others of the benefits that come from hard work and dedication.



And, importantly, Mx. Sanders is surrounded by a community of people who are all equally dedicated to helping one another stay sober. Mx. Sanders regularly shares her own struggles with drug addiction and has been helping others in their own recovery.

It is difficult to understate just how significant this turn-around has been. Prior to her arrest in this case, Mx. Sanders was unhoused, addicted to a deadly drug that threatened to take her life every day. Now, she's finally living a life of normalcy and productivity.

## IV.  The Court Should Impose a Sentence of 48 Months

### A.  A Combination of Circumstances Departure (or Equal Variance) Is Warranted

A downward departure under U.S.S.G. § 5K2.0, or an equivalent variance under 18 U.S.C. § 3553(a), is warranted for numerous reasons.

DEFENDANT'S SENTENCING MEMORANDUM

1             1.    *Mitigated Circumstances of Offense*

2      As outlined above, Sgt. Meyer approached Mx. Sanders for drugs, not the

3 other way around. As an addict whose job it was to help Marines through their

4 addictions, he was well-versed in the dangers of fentanyl and went into this

5 transaction seeking fentanyl and knowing that fentanyl had been provided.  Mx.

6 Sanders served only as a "middle" for the transaction, serving to get the fentanyl

7 from the supplier to Sgt. Meyer, and thereafter get Sgt. Meyer's cash payment to the

8 supplier.  Mx. Sanders received no cash payment for the offense, only a portion of

9 the drugs that she used to stave off her own dope sickness.  The mitigated nature of

10 the offense warrants a significant departure or variance.

11            2.    *Mx. Sanders's History of Trauma and Abuse*

12     As explained above, in the psychological evaluation provided by the defense,

13 and in the PSR, Mx. Sanders survived a childhood and adolescence that was rife with

14 abuse, drug use, sexual abuse, sexual exploitation, violence, and instability.  That Mx.

15 Sanders became addicted to fentanyl is unsurprising given that nearly every adult in

16 her life had gone through the same.  This history warrants a departure or variance.

17            3.    *Treatment of Trans and Gender Non-Binary Individuals in BOP Facilities*

18     As a non-binary individual who presents as both male and female, it is a

19 virtual certainty that Mx. Sanders will have a far more difficult experience in custody

20 than a cis-man or cis-woman.  Both anecdotal and academic research supports this

21 proposition.

22     Anecdotally, Mx. Sanders herself has had traumatic experiences in custodial

23 settings as a result of violence and bullying she has been subjected to as a gender

24 non-binary person.  Most recently, at the MCC, her experience as a non-binary

25 person resulted in her mental decompensation, such that she was placed on suicide

26 watch.  It was the same feelings of having to reject her identity and present as more

27 masculine than she is that resulted in similar suicide attempts as a youth.

28     Mx. Sanders's experience is supported by research and data.  According to

UCLA's Williams Institute, trans-inmates are more than 10 times more likely than non-trans inmates to be assaulted,[6] including over 9 times more likely to be assaulted by staff.  *See id.*  When compared to non-trans inmates, trans inmates are also nearly three times as likely to suffer from serious mental health concerns while in custody.  *See id.*  And trans inmates are almost twice as likely as non-trans inmates to be put in solitary segregation.  *See id.*

The reasons for increased harassment, assault, mental decompensation, and solitary confinement are no doubt attributable to the fact that transgender individuals "are typically housed in sex-segregated facilities according to their genitalia; thus, transgender women who have not had gender confirmation surgery are placed in male facilities where they are at-risk for mistreatment."[7]  Due to the stigma associated with "feminine gender identity and/or expression, transgender women incarcerated in male facilities are especially at risk for verbal harassment, physical violence, and sexual assault."  *Id.*  As Max Disposti (featured in Mx. Sanders's sentencing video), the Executive Director of the North County LGBTQ Resource Center and a member of the LGBT Advisory Board to the San Diego County Sheriff's Department, puts it, custodial settings for trans and non-binary individuals can be "deadly."

B.    3553(a) Factors

A 48-month sentence is warranted under the 18 U.S.C. § 3553(a) factors.

1.    *Mx. Sanders's History and Characteristics*

The Court would be hard-pressed to find a defendant who had survived more hardship and adversity than Mx. Sanders.  She was exposed to drugs in-utero, left

---

[6] *See* Prevalence, characteristics, and sexual victimization of incarcerated people in the United States, UCLA's Williams Institute, *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Incarceration-Violence-Oct-2016.pdf (last visited June 3, 2024).

[7] Creating, Reinforcing, and Resisting the Gender Binary: A Qualitative Study of Transgender Women's Healthcare Experiences in Sex-Segregated Jails and Prisons, Int J. Prison Health (June 11, 2018) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5992494/ (last visited June 3, 2024).

without any stable or consistent role models, subjected to every form of abuse imaginable, and was left to grapple with a sexual orientation and gender identity that no one in her life, or even the system, was equipped to handle.

### 2.   The Need to Avoid Unwarranted Sentencing Disparities

In *United States v. Shepherd et al.*, 20cr810-BAS, co-defendant Kolin, like Mx. Sanders, served as the "middle" in a drug transaction between the decedent and the dealer.  *See* 20cr810-BAS at Doc. 142 (Gov. Sentencing Memorandum) at 1:23-25 ("[C]o-defendants Kolin and Shepherd are being held responsible for the distribution of fentanyl that materially contributed to the death of P.E.R., who was eighteen years old."); *see also id.* at Doc. 161 (Gov. Sentencing Memorandum) at 2:4-5 ("Shepherd . . . ultimately agreed to let Kolin 'middle' a drug deal here.").  Mr. Kolin introduced the decedent to the dealer.  He apparently earned no money for his efforts but did receive fentanyl.  In that case, the Court imposed a sentence of 33 months' custody.

In *United States v. Busse et al.*, 21cr2158-BAS, Mr. Busse sold 40 grams of fentanyl to the decedent, using co-defendants Lathan and Santiago to deliver the substance and collect payment.  *See* 21cr2158-BAS at Doc. 175 (Gov. Sentencing Memorandum) at 3:16-21 ("BUSSE arranged with co-defendants [] Lathan and [] Santiago . . . to deliver the fentanyl to B.W.J. [the decedent] and to collect payment from him.  The cash payment was then to be delivered by them to BUSSE.").  The Court sentenced Ms. Lathan to 68 months in custody and Mr. Santiago to 78 months in custody.

Like Mr. Kolin, Ms. Lathan, and Mr. Santiago, Mx. Sanders was not the dealer or supplier of the drugs.  Instead, she merely reached out to one of her own connections when asked by Sgt. Meyer, and served as a delivery person of the substance.  She received no financial payment for her role in the offense.

Mx. Sanders recognizes that in both of the above-cited cases, the dealer/supplier of the fentanyl was a named defendant.  The government has opted not to pursue charges against the dealer/supplier of the fentanyl in this case.

Nonetheless, the dealer/supplier's presence looms large in the events leading to Sgt. Meyer's death and should be taken into account when fashioning a sentence.

### 3. The Need to Afford Specific and General Deterrence

No more than the requested sentence is necessary to deter Mx. Sanders. The offense was entirely addiction-motivated. She is now clean and sober and has the resources and wherewithal to remain so. Principles of general deterrence are likewise satisfied with the requested sentence because it is a lengthy sentence for someone like Mx. Sanders, who has never been arrested or charged with a drug trafficking offense, and who served merely to connect a knowing buyer with a supplier.

### 4. The Need to Provide Rehabilitation and Resources to Mx. Sanders

Custodial time is counterproductive to Mx. Sanders's recovery. And because of her gender identity, it is in fact a dangerous proposition. More than 48 months of custody, though, would serve only to further isolate Mx. Sanders from her prosocial network and to undermine the significant work she has done to get a grip on her addiction.

## V.   BOP Designation Requests

First, Mx. Sanders requests that the Court recommend that she be evaluated for participation in the BOP's Residential Drug Abuse Treatment Program ("RDAP").

Second, Mx. Sanders requests that the Court recommend that she be housed with females. In the past, the most dangerous custodial situations for Mx. Sanders has been when she is housed with men. In those settings, Mx. Sanders has to, for her own survival, go back in the closet and deny her true gender identity, all as a means to protect herself from physical harm. In male custodial settings, she is more likely to be put in forced solitary confinement and to be at risk for assault. Accordingly, Mx. Sanders respectfully requests that the Court recommend that she be housed in a female facility.

Third, Mx. Sanders requests that she be medically evaluated for hormone

8

replacement therapy so as not to interrupt her current therapy treatment.

Finally, Mx. Sanders requests designation to a facility as close to San Diego County as possible in order to facilitate family visitation.

## VI. Request for Self-Surrender Date

Mx. Sanders respectfully requests that she be permitted to remain out on bond and self-surrender directly to her designated facility. The reason for the request is two-fold. First, Mx. Sanders is, by all costs, attempting to avoid custody at MCC or one of the other local facilities. While in custody initially, Mx. Sanders had a terrible experience at MCC and was placed on suicide watch. Second, Mx. Sanders is receiving hormone replacement therapy. She will be seeking authority from the doctors at her BOP facility to continue with that therapy. So as to facilitate continuity of care, Mx. Sanders should be permitted to go straight to her designated BOP facility, where she can be more quickly evaluated for hormone replacement therapy, versus at the MCC where services are inconsistent and delayed.

## VII. Conclusion

From every angle you look at it, this case is a true tragedy. Sgt. Meyer didn't deserve to die. He was an addict struggling against a powerful drug designed to strip away, little by little, any semblance of will power and the person underneath the addiction. But the same was true of Mx. Sanders, who did not ask to be addicted to fentanyl and who did not ask to be reached out to by Sgt. Meyer.

Mx. Sanders asks that the Court impose a sentence that does justice not only for Sgt. Meyer and his family, but that honors the life circumstances that led to Mx. Sanders's addiction and conduct.

The Court should impose a sentence of 48 months' custody (12 of which are to be served in home detention), with three years' supervised release to follow.

Respectfully submitted,

Dated: June 3, 2024

s/ Carson P. Baucher
Federal Defenders of San Diego, Inc.
Attorneys for Mx. Sanders
Email: Carson_Baucher@fd.org

# EXHIBITS TO DEFENDANT'S SENTENCING MEMORANDUM

*United States v. Jesse Sanders*
23-CR-270-BAS-1

| | |
|---|---|
| Exhibit A | Mx. Sanders's Letter to the Court |
| Exhibit B | Facebook Messenger Exchange between Mx. Sanders and Sgt. Meyer |
| Exhibit C | Letters of Support[1] |
| Exhibit D | Article Relating to July 2019 Stabbing of Mx. Sanders |
| Exhibit E | Article Relating to December 2019 Shooting of Mx. Sanders |
| Exhibit F (Submitted Under Seal) | Sgt. Meyer's Autopsy Report |
| Exhibit G (Submitted Under Seal) | Psychological Evaluation of Mx. Sanders |

---

[1] Note that twelve additional Letters of Support were provided to the United States Probation Office and are summarized as follows in paragraph 61 of the Presentence Investigation Report:

> These letters, written by various individuals with different relationships to her, collectively paint a vivid portrait of SANDERS as a resilient, compassionate, and determined individual. Despite her troubled past and experiences with addiction, SANDERS is portrayed as someone who has overcome significant challenges and is committed to her journey of recovery and personal growth. Her friends, family, colleagues, and even a professor all attest to her kindness, intelligence, and unwavering dedication to helping others. They commend her efforts in rehabilitation, highlighting her positive impact on those around her and her aspirations for a brighter future, including pursuing education and a career in healthcare. Through their letters, these individuals advocate for understanding, compassion, and support for SANDERS, urging for a rehabilitative approach to her case and emphasizing her potential to thrive if given the opportunity.

# Exhibit A

Your Honor,

I am writing to you today with a heavy heart, attempting to express my sincere remorse for my actions and to acknowledge the pain I have caused. I also wish to convey the profound transformation I have undergone during my recovery journey.

First, I would like to express my utmost, heartfelt condolences for the loss of Sgt. Meyer. I can only imagine how incredibly painful and difficult the last couple of years have been for Sgt. Meyer's family. There's no explanation, no excuse, no words I can say to make this any easier. I am just so sorry for what I did and for the loss of someone who seems like he was a wonderful husband, son, serviceman, and person. I understand that there will be consequences for what I have done, and I will accept those consequences as they come.

The guilt I feel for what I have done weighs heavy on my heart. Not a single day goes by that I don't think about the pain that Sgt. Meyer's family must be in.

I stand before you, not as a criminal who had ill intentions, but as a person who wants to turn this tragedy into something good. I have battled a formidable adversary— addiction.  The shadows of addiction have haunted not only me, but also the generations before me. The cycle of trauma and substance abuse on me and my family has been relentless, robbing me of my childhood, adolescence, and parts of my adulthood. But I am proud to say that I have used this case to turn my life around and to be a better person for myself, my family, and society. I am committed to staying sober and I look forward to a future where I can contribute positively, helping other avoid the same pitfalls that have ensnared me. Each day of my recovery is a testament to my commitment to change and to not letting Sgt. Meyer's death be in vain.

I want to emerge from this ordeal as a force for good, someone who can make amends and contribute positively to society. I ask that the Court allow me the opportunity to rebuild my life and, in turn, contribute to the well-being of others.

Sincerely,
**Jesse Sanders**
*He / she / his / her*

# <u>Exhibit B</u>

**Thread** (4511528922256626)
**Current** 2022-10-21 22:58:09 UTC
**Participants** Zachary Meyer (Facebook: 100007136924787)
Jesse Sanders (Facebook: 100001986896431)

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2021-12-28 17:41:09 UTC
**Body** Hey what's up

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2021-12-28 20:02:35 UTC
**Body** Were you on intervention

**Author**
Zachary Meyer (Facebook: 100007136924787)
**Sent** 2021-12-28 21:16:21 UTC
**Body** I was trying to get some of your connections if you had any

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2021-12-28 21:17:07 UTC
**Body** My number is ████████ let me know

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-01 02:36:24 UTC
**Body** I was on intervention yes

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-01 02:54:25 UTC
**Body** Ok

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-01 03:28:44 UTC
**Body** Are you still in oside

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-01 03:34:45 UTC
**Body** Yes I am  unfortunately haha why what's up?

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-01 03:39:46 UTC
**Body** I don't know if you partake in certain things still but if so we could link up if not that's cool too I know you don't really know me

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-01 16:56:30 UTC
**Body** And my bad if you stopped doing that stuff I know it can be hard to get clean and stay clean

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-01 21:30:02 UTC
**Body** I'll also pay for both of us

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:02:18 UTC
**Body** No no I actually am still dabbling what are you looking for exactly agaimn?/

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:06:19 UTC
**Body** H or fent whichever one i could meet up tommorow around 11 or 12

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:06:40 UTC
**Body** Or Tuesday

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:09:38 UTC
**Body** OK what amount are you looking for ?/

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:10:04 UTC

**Body**
150 worth and ill split it with you

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:10:29 UTC
**Body** OK fasho . I'll let you know what's up I'll arrange for that

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:10:37 UTC
**Body** And then I'll tell you a meeting spot

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:10:58 UTC
**Body** Ok just message me the details tommorow at 11

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:11:15 UTC
**Body** Whereabouts if you don't mind are you located ?

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:11:20 UTC
**Body** Generallh

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:11:26 UTC
**Body** Generally*

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:11:32 UTC
**Body** I am on the base

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 01:11:43 UTC
**Body** Ahh OK i see cool

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 01:57:18 UTC
**Body** Let me know of we are good tommofow or need to do a different dsy

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:15:17 UTC
**Body** Morning

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:15:53 UTC
**Body** Good morning

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:18:46 UTC
**Body** Is everything all good for today

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:19:16 UTC
**Body** Sorry busy night last night. Yes it is all good on my end

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:19:36 UTC
**Body** Ok where did you want to meet up and when

**Author**
Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:21:49 UTC
**Body** So we will meet at The Harbor Inn except  I need you to park on
the East side of the building where the main road is you'll see once
ur their

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:22:08 UTC
**Body** And as soon as possible

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:22:18 UTC
**Body** Ok I can leave now

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:22:20 UTC
**Body** Whenever you're ready

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:22:31 UTC
**Body** Ok give me a few to get there

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:22:34 UTC
**Body** OK let me see something reakkybquic k?/

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:22:46 UTC
**Body** Really quick k? *

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:24:00 UTC
**Body** Ok

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:24:00 UTC
**Body** Same.amount ? Right ?

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:24:05 UTC
**Body** Yes 150

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:24:08 UTC
**Body** K

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:27:17 UTC
**Body** Heading there now

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:28:11 UTC
**Body** OK hold on one sec there might be a change cuz for some reason
my persons phone is dead but I have a back up person lemme
make a call

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:28:31 UTC

**Body**
   Ok

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:28:31 UTC
**Body** I'm sorry you'll getbit within your time limit t hough

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:28:46 UTC
**Body** No problem

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:31:22 UTC
**Body** OK we got it can you make it to Carlsbad village Dr?

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:31:54 UTC
**Body** Yes headed there now

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:32:33 UTC
**Body** OK go to the extended stay

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:32:42 UTC
**Body** 12 mins

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:32:47 UTC
**Body** Right off the exit to the right

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:34:38 UTC
**Body** The falls bad 1

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 17:34:46 UTC
**Body** Carlsbad

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:34:57 UTC
**Body** Yessir

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 17:40:33 UTC
**Body** When u pull into the extended stay go left and keep going  till u
      see a rv on the left and a black car next to it park in the spaces
      along the driveway you'll be driving on to the left

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:06:32 UTC
**Body** Oh and by the way do you have Narcan?  In case ever anything ?

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:06:37 UTC
**Body** You sent a photo.
**Attachments** image-1538396016558011 (1538396016558011)
              **Type** image/jpeg
              **Size** 47596

10:06                     7%

Q    Search Products

# Save a life with naloxone.

CVS Health® is dedicated to helping communities address and prevent prescription drug misuse, which is why we've worked to increase access to naloxone.



**Available without an individual prescription nationwide, naloxone, also known as NARCAN®, is a safe and effective antidote to opioid overdoses. CVS Pharmacy® locations nationwide have naloxone on hand and can dispense it the same day or order for the next business day.**

## About naloxone

|||          ◯          ‹

**Photo ID**

1538396016558011

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:07:29 UTC
**Body** You can get it anywhere no prescriptions no purchase justvwalk in and ask and they're legally mandated to provide it to you then and there.

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:08:07 UTC
**Body** Sorry if you already know I just want y'all to be safe . lots of love have an awesome day

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:09:21 UTC
**Body** You too and this stuff is pretty good please be careful

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:09:35 UTC
**Body** I don't inject or anything just snort and its strong for.me

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:09:39 UTC
**Body** Be safe

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:10:19 UTC
**Body** Absolutely :) I'm glad you enjoy the quality

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:11:04 UTC
**Body** It helps I'm stressing hella today I'm so screwed lol.but that's something I'll figure out haha

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:11:09 UTC
**Body** Nvermind me lol

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:11:10 UTC
**Body** Yes definitely and I'm glad you didn't rip me off you know how risky this business is

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:11:18 UTC
**Body** I could never

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:11:23 UTC
**Body** That's so childish

**Author** Zachary Meyer (Facebook: 100007136924787)

**Sent**

2022-01-02 18:11:43 UTC
**Body** And I hope that I was able to.help you out today I'm not greedy and like to share

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:11:43 UTC
**Body** Ppl are mean it doesn't pay to be an ugly person to people

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:11:52 UTC
**Body** It definitely does not

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:12:20 UTC
**Body** I will text you when it's safe not to talk to me like I said before I don't want my wife to find out

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:12:39 UTC
**Body** Absolutely you actually helped tremendously. I don't have to hussle as much today and potentially land in jail trying to make money.

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:12:43 UTC
**Body** And OK I understand

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:12:50 UTC
**Body** We can message now but once I say no more texts then wait for me tonhitnyounup

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 18:13:02 UTC
**Body** To hit you up

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:13:05 UTC
**Body** Absolutely

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:14:05 UTC
**Body** OK understood , you seem a very genuine person I can tell if someone Is shady right off the bat but I like your vibe

**Author** Jesse Sanders (Facebook: 100001986896431)
**Sent** 2022-01-02 18:15:55 UTC
**Body** There arent many like us left ... Its truly the end of times.

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 22:13:23 UTC
**Body** Who the fuck are you

**Author** Zachary Meyer (Facebook: 100007136924787)
**Sent** 2022-01-02 22:13:27 UTC
**Body** Is zach with you

# Exhibit C

# Yassef Ayub Boggeano

██████████████
██████████████

June 2, 2024

To the Right Honorable Judge presiding over the case against Jesse Sanders

Your Honor,

I am writing to provide a character reference for Jesse Sanders, whom I had the privilege of meeting in February 2024 during my time in rehab. From the moment I met Jesse, it was clear that she possesses an extraordinary level of dedication and commitment to her recovery journey and the broader recovery community.

Throughout my time in rehab, Jesse consistently demonstrated a profound sense of responsibility and a genuine passion for helping others. She actively participated in all group sessions we attended together, offering support and encouragement to her peers with an empathetic and non-judgmental approach. Her willingness to share her experiences and listen to others created a positive and uplifting environment that greatly contributed to the collective healing process.

Jesse's commitment to serving the recovery community extends beyond her time in rehab. She has taken on leadership roles in various support groups, where she continues to inspire and guide individuals on their paths to recovery. Her dedication is evident in her proactive involvement in organizing events, facilitating discussions, and providing one-on-one mentorship to those in need. Jesse's compassionate nature and unwavering support have made a significant impact on many lives, fostering a sense of hope and resilience within the community.

Jesse's personal growth and transformation since entering rehab are a testament to her strong character and determination. She embodies the principles of honesty, integrity, and perseverance, which are essential qualities for anyone committed to long-term recovery. I have no doubt that Jesse will continue to make meaningful contributions to the recovery community and beyond.

In conclusion, I wholeheartedly endorse Jesse Sanders as a person of exceptional character and dedication. Her commitment to serving and supporting others in their recovery journey is truly inspiring. If you have any further questions or require additional information, please do not hesitate to contact me.

Yours faithfully,

Yassef Ayub Boggeano
Private Citizen
Acquaintance

To whom this may concern.

I am writing on behalf of Jesse Sanders.

I personally know Jesse through recovery.

He is an amazing asset to the community within recovery. He keeps coming back to the rehabilitation place I'm currently residing in. He is doing outstanding job at staying sober.

They have helped me with my recovery when I needed it the most.

He is there for me when I need a shoulder to lean on and offers great advice, love and encouragement.

Jesse goes to 5/6 meeting per week, they're putting their time and effort into their recovery. I see him at most of the same meeting and that's how I know he is sober and the meetings work.

He takes it one day at time, nothing more, nothing less.

If you have any questions or concerns

Feel free to contact me


Anthony Pagan

# Exhibit D



BREAKING        Sen. Dianne Feinstein, longest-serving woman in the Senate, dies at age 90

# Woman Stabbed in Fight Near Oceanside Pier

Oceanside police launched a search for the stabbing suspect by ground and helicopter, and found him two blocks away from the scene, Sgt. Lonny Harper said

By NBC 7 Staff • Published July 9, 2019 • Updated on July 11, 2019 at 7:57 am



A woman was stabbed during a fight near the Oceanside Pier. NBC 7's Nicole Gomez reports.

confirmed.

Oceanside Police Department Sgt. Lonny Harper said officers received reports of a fight among a group of people just after 12:30 a.m. at Pier View Way and Tremont Street. The area is near several restaurants, just a few blocks away from the Oceanside Pier.

When officers arrived, they found a woman suffering from a stab wound. The stabbing suspect had fled.

Harper said officers quickly set up a perimeter around the scene and began searching for the suspect. The San Diego County Sheriff's Department assisted by launching its ASTREA helicopter over the area.

Soon, police found the suspect about two blocks away from the scene and arrested him, Harper said.

The victim was taken to a local hospital. As of early Tuesday morning, there was no update on her condition.

No one else was hurt in the fight. The incident is under investigation.

SENIOR SAVINGS ACCOUNTS | SEARCH ADS | SPONSORED

**These Banks Are Offering Seniors Insanely High Interest Savings**

THE PINEAPPLE LIFE | SPONSORED

**Here Are 50 of the Coolest Gifts for This 2023**

Read More

DAILYSTUFF | SPONSORED

**Twiggy Used to Be A Supermodel & This is Her at 73**

Read More

# Exhibit E



**CRIME**

# Oceanside Police Search for Suspect in Transit Center Shooting

 by **Christine Huard**
December 22, 2019



**Times of San Diego Uses Cookies**

This website, like most media sites, uses small files called cookies to anonymously customize the advertising that you see.
Learn more about how we use cookies in our cookie policy.

OK

The unidentified victim was in stable condition with non-life threatening injuries.

```
Google Maps Platform rejected your request. Invalid request. Invalid 'q' parameter.
```

"This incident occurred because of a personal dispute and appears not to be gang-related in nature," Bussey said.

"The victim told officers the suspect was staying at a hotel on North Coast Highway," he said. "Officers went to the hotel and were able to gain entry into the suspect's room. However, the suspect was not in the room."

The suspect's description was not immediately available.

The police department's Crime of Violence Unit is investigating the shooting.

— *City News Service*

**Times of San Diego Uses Cookies**

This website, like most media sites, uses small files called cookies to anonymously customize the advertising that you see. Learn more about how we use cookies in our cookie policy.